**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | **No. CR-25-01233-TUC-AMM (EJM)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Mario Humberto Flores-Mendivil, | |
| Defendant. | |

Pending before the Court is a Motion to Suppress for Lack of Reasonable Suspicion (Doc. 50). The defendant, Mario Humberto Flores-Mendivil, is charged in a three-count indictment with Conspiracy to Transport Illegal Aliens for Profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), & (a)(1)(B)(i), and two counts of Transportation of Illegal Aliens for Profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (a)(1)(B)(i). (Doc. 27.) On September 8, 2025, the defendant filed a Motion to Suppress for Lack of Reasonable Suspicion arguing that Border Patrol agents stopped his vehicle without reasonable suspicion that criminal activity was afoot; therefore, the evidence obtained from the unlawful stop should be suppressed. (Doc. 50.)

On November 3, 2025, the Court held an evidentiary hearing on the Motion to Suppress. Border Patrol Agent Casey Sartin and Border Patrol Agent Dalton Myers testified. Based on that testimony and the other evidence presented, the Court recommends that the District Court grant the motion.

1    **I.**    **THE EVIDENTIARY HEARING**

2        **A.**    **Border Patrol Agent Casey Sartin**

3            1.  Direct examination

4        Casey Sartin has been a Border Patrol Agent for fifteen years and has been stationed

5    in Douglas, Arizona his entire career.  (Hr'g Tr. 11/3/25 at 5-6, Doc. 75.)  Agent Sartin

6    attended the Border Patrol academy for six months and has regular trainings four times a

7    year.  (*Id*. at 6.)

8        On Saturday February 1, 2025, Agent Sartin was on duty from 6:00 a.m. to 2:00

9    p.m. (*Id*. at 7.)  He started his shift by attending a muster where agents were provided with

10    information about criminal activity that occurred the prior day.  (*Id*.)  Agent Sartin was

11    advised that there was a group of about five suspected illegal aliens "that were potentially

12    coming up to Highway 80" around mile marker 405 near Skelton Canyon.  (*Id*.)   Because

13    of the mountain range in the area, illegal aliens commonly appear around that mile marker.

14    (*Id*. at 7-8.)  Illegal alien activity is common in that area on Highway 80 because it is

15    extremely remote and there are no cameras.  (*Id*. at 9.)  There is "a long stretch [of road]

16    where [there are] miles and miles of pretty much nothing besides some random ranch

17    houses here and there[.]"  (*Id*.)   Highway 80 is a two-lane road that runs for about eighty

18    miles from Douglas, Arizona to Interstate 10 which leads into New Mexico.   (*Id*. at 12-

19    13.)   Traffic on Highway 80 on the weekends is slower than weekdays because there are

20    not "as many people going back and forth to work the ranches."  (*Id*. at 12.)

21        After muster, Agent Sartin went to mile marker 398 on Highway 80 to look for

22    vehicles that may be loaded with illegal aliens.  (*Id*. at 12-13.)   Agent Sartin parked his

23    marked Border Patrol vehicle on the side of the road at that mile marker because "it's a

24    straightaway stretch" which allowed him to view vehicles travelling in either direction on

25    Highway 80.  (*Id*. at 13, 17-18.)  Agent Sartin noticed two vehicles travelling southwest on

26    Highway 80 toward Douglas "that looked like they were driving together."  (*Id*. at 13.)

27    The first vehicle, a Pontiac SUV, had temporary tags which made Agent Sartin suspicious

28    based on his experience.  (*Id*. at 15.)  The second vehicle, a Chrysler sedan, had a California

license plate affixed to the front bumper of the vehicle. (*Id*. at 13.)  Agent Sartin decided to follow the vehicles because it seemed "out of the norm" for a vehicle from California to be "going through that area."  (*Id*. at 13-16.)  The vehicles "kept that same proximity" to each other which was suspicious because they were travelling on a long and flat straightaway where vehicles can easily pass one another.  (*Id*.)  There is not "a double yellow line that requires people not to pass" and Agent Sartin does not recall much, if any, "oncoming traffic heading towards New Mexico that would have prevented them from passing[.]"  (*Id*.)

After following the vehicles for about ten miles, Agent Sartin pulled into the opposing lane of traffic to pass the Chrysler and get his vehicle behind the SUV.  (*Id*. at 17-19.)  As Agent Sartin was passing the Chrysler, he tried to see if there were passengers or the driver's reaction "but the windows were extremely tinted."  (*Id*. at 17.)  Because of the window tint, all he could see was "basically a shape" of the driver.  Agent Sartin "really wanted to take a look" at the Pontiac SUV that had temporary tags.  (*Id*. at 18.)  It took Agent Sartin a while to pull behind the Pontiac SUV because "[t]here wasn't a big gap between the two vehicles."  (*Id*. at  18-19.)  Once he got his vehicle behind the Pontiac SUV, Agent Sartin ran a records check on the temporary tag.  The records check revealed that the Pontiac SUV was recently registered in Tucson, Arizona. (*Id*. at 19.)

Agent Sartin then pulled alongside the Pontiac SUV in the opposing lane of traffic to look at the driver and in the rear passenger area.  (*Id.* at 19.)  He could not see into that area because "the vehicle had dark tint in the rear windows[.]"  (*Id*. at 19-20.)  In Agent Sartin's experience, someone driving many miles and hours would appear relaxed.  (*Id*. at 20.)   However, the driver of the Pontiac SUV appeared nervous because she was "tightly gripping the steering wheel" and was stiff.  (*Id*. at 20.)  In Agent Sartin's experience, drivers are usually nervous when he pulls "alongside of them, especially if they're involved in something illicit."  (*Id*. at 20.)  The driver was "looking straight ahead, almost acting like" she was not even aware he was there.  (*Id*.)  But the driver's "stiffness" made it obvious to Agent Sartin that she was "extremely aware" that he was looking at her.  (*Id*.)

1     After Agent Sartin saw the reaction of the driver, he decided that he "was definitely
2  going to pull them over for an immigration inspection[.]"  (*Id*. at 21.)  Once again, it was
3  difficult for Agent Sartin to pull behind the SUV because the "Chrysler was again still just
4  following at a pretty close space."  (*Id*.)  Agent Sartin had to "kind of nudge [his] way in
5  to have that safety zone" because they were travelling about 65 miles per hour, and it felt
6  "a lot safer having a couple car lengths between vehicles."  (*Id*. at 21.)

7     Agent Sartin requested assistance from other agents in the area because "it's kind of
8  common for these vehicles to protect . . . the illegal aliens.  There's commonly a scout or
9  another vehicle that drives with these to where they take it out of the driver's hands and
10  they secure what they're picking up.  So one driver doesn't even know where they're going
11  to be picking up these illegal aliens."  (*Id*. at 21-22.)  Based on his experience, Agent Sartin
12  "knew one of these vehicles was going to have illegal aliens in it."  (*Id*. at 22.)

13     Agent Sartin specifically asked Agent Myers, who was at mile marker 384, to get
14  behind and follow the Chrysler sedan.  (*Id*. at 22.)  Agents commonly park at mile marker
15  384 because "you can see quite a long stretch of the highway" and it's at a higher elevation.
16  Agent Sartin and Agent Myers decided to stop both vehicles "relatively close to each other
17  at the same time."  (*Id*. at 25.)  At around mile marker 377, Agent Sartin activated his
18  vehicle's emergency lights and siren; the Pontiac SUV pulled to the side of the road "within
19  a reasonable time."  (*Id*.)  Agent Myers pulled over the Chrysler about 100 yards west of
20  where Agent Sartin made his stop.  (*Id*.)

21     Agent Sartin believed the vehicles were travelling in tandem based on the following
22  facts.  First, the distance between the vehicles and the number of miles they maintained
23  this distance.  (*Id*. at 26.)  Second, the difficulty he had getting between the vehicles.  (*Id*.)
24  Third, the temporary tags on the Chrysler which is common for vehicles involved in alien
25  smuggling because the "vehicles are often bought at a cheaper rate" to minimize loss if the
26  vehicle is ultimately seized by law enforcement.  (*Id*. at 27.)  Fourth, the Chrysler was
27  registered in Tucson and agents do not see too "many people from Tucson coming from
28  New Mexico using that route of highway."  (*Id*.)  Fifth, it was unusual to see a vehicle

registered in Tucson travelling southwest on Highway 80 because "if you were coming from New Mexico or Texas, you would typically stay on Interstate 10 to go to Tucson." (*Id.*) Travelling on Highway 80 "would be a long roundabout" and "there isn't much reason to be on Highway 80 going that route." (*Id.* at 27-28.) Similarly, a vehicle registered in California that is coming from New Mexico or Texas would typically stay on Interstate 10 to return to California. (*Id.* at 28.) Sixth, "there's nothing out there" where the stop occurred. (*Id.*) Seventh, neither vehicle had a connection to Douglas, Arizona, and vehicles "coming to visit people in Douglas . . . typically, do not end up on the east side of Douglas." (*Id.*)

### 2. Cross-examination

Highway 80 is not a dirt road or ranch road; it is a well maintained two-lane paved road that runs east and west. (*Id.* at 32-33.) Highway 80 connects Douglas, Arizona to Interstate 10, which runs to New Mexico and Texas. (*Id.* at 33.)

The Chrysler sedan with the California license plate "was trailing the Pontiac" SUV which had temporary tags. (*Id.*) The vehicles were not speeding or driving too slowly, they did not make any unusual turns or stops, and they did not try to avoid Border Patrol agents. (*Id.* at 34-35.)

Agent Sartin's report does not mention how close the Chrysler sedan was to the Pontiac SUV either when he first saw the vehicles or as he followed them for ten miles. (*Id.* at 34.) His report also does not mention that the Crysler was "tailgating" the SUV. (*Id.*) Agent Sartin's report also does not mention where the recent crossing of a group of illegal aliens occurred, the time of day the group was seen, or what they looked like. (*Id.* at 36.) Agents did not have any information that either a Pontiac SUV or Chrysler sedan was seen near the border. (*Id.* at 37.) Agent Sartin never had a clear view of the driver of the Chrysler. (*Id.* at 40.) However, his report does not mention the Chrysler "having problems with tint[.]" (*Id.* at 38.)

Agent Sartin did not see the vehicles travelling northeast on Highway 80; he only saw them travelling southwest toward Douglas, Arizona. (*Id.* at 36.) He did not know

where either vehicle was coming from. (*Id.*)   Both vehicles were lawfully registered and neither was a rental vehicle. (*Id.* at 37.)

In 2018, Agent Sartin was formally disciplined for false reporting to a law enforcement officer who responded to a traffic accident. (*Id.* at 42.)   Agent Sartin initially told the officer that he was wearing a seatbelt at the time of the accident.  He later admitted that he was not wearing a seatbelt. (*Id.* at 43.)

### 3.  Re-direct examination

Agent Sartin believes that a Pontiac SUV has more cargo capacity than a Chrysler sedan. (*Id.* at 43-44.)  When Agent Sartin was driving beside the Pontiac SUV, he did not have a clear view of the rear passenger area of the vehicle because the rear windows were tinted. (*Id.* at 44.)  As a result, he could not tell if the rear passenger area was occupied or unoccupied. (*Id.*)

### 4.  The Court's examination

The Chrysler was about "a car length and a half" behind the Pontiac SUV from the time Agent Sartin first saw the vehicles until when he pulled his vehicle behind the Pontiac SUV to perform the traffic stop. (*Id.* at 46.)  The Chrysler was also "a car length and a half" behind Agent Sartin's vehicle once he got behind the Pontiac SUV. (*Id.* at 46-47.) Agent Sartin's report does not mention that the Chrysler was "a car length and a half" behind the Pontiac SUV. (*Id.* at 52.)

The purpose of tandem driving is to "separate the people that are recruiting the drivers." (*Id.* at 47.)  A "handler" coordinates with people in Mexico; the handlers "don't necessarily trust the people they recruit because they don't typically know them from cities of Tucson and Phoenix.  So they recruit a driver that's going to be taking the risk if they are caught.  And, obviously, the handler kind of isolates themselves from the risk." (*Id.* at 47.)   During tandem driving, it is common for the vehicle that is not transporting illegal aliens to "take off" to mislead law enforcement. (*Id.* at 47-48.)

With respect to the significance of the defendant travelling southwest on Highway 80, rather than northeast away from the border, sometimes a driver will "go all the way

east" on Interstate 10 to not attract the attention of Border Patrol by going northeast on Highway 80 and coming back southwest on the same road. (*Id*. at 48.) However, a handful of times a driver will travel northeast on Highway 80, pick up illegal aliens, and then travel southwest on Highway 80. (*Id*. at 49.)

After he was shown photographs of the SUV, Agent Sartin changed his earlier testimony regarding whether the tinting on the rear windows of the Pontiac SUV prevented him from seeing into the rear passenger area. He testified that "[i]f there were people sitting upright" in the Pontiac SUV, he "would have been able to tell how many passengers were sitting up." (*Id*. at 51.) He could not see if people were "laying on the floorboard or under carpet" in the rear passenger area. (*Id*.) However, his inability to see if people were on the floor of the Pontiac SUV was not because of the tinting; rather, it stemmed from the fact that he was "looking across" his vehicle into the Pontiac which was travelling at 65 miles per hour. (*Id*.)

### B. Border Patrol Agent Dalton Myers

#### 1. Direct Examination

Dalton Myers has been a Border Patrol Agent for three-and-a-half years. (*Id*. at 54.) He attended the Border Patrol Academy for six months and has quarterly trainings. (*Id*.) Agent Dalton has had several assignments during his career, including patrolling in the Douglas area of responsibility. (*Id*.)

On February 1, 2025, Agent Dalton worked from 6:00 a.m. to 2:00 p.m. (*Id*. at 55.) He began his shift at muster where agents were informed about a group of suspected illegal aliens that were seen the prior day somewhere between mile markers 392 and 402 on Highway 80. (*Id*.) That area is desolate and has a good line of sight and not a lot of traffic. (Id. at 55-56.) For those reasons, it is common area to patrol because there are groups of suspected illegal aliens in the area every day. (*Id*. at 56.) There are culverts and brush on the side of Highway 80 that people can hide in while waiting for a vehicle to pick them up. (*Id*.) The area is "pretty far away from the actual border itself, so response time is a little harder to get out there." (*Id*. at 55.)

At around 7:30 a.m., Agent Myers went to mile marker 384 on Highway 80.  (*Id.* at 57.)  He had a clear view of Highway 80.  (*Id.* at 58.)  There is hardly any traffic on Highway 80 other than local ranchers.  (*Id.*)  There is not typically any tourist traffic.  (*Id.*)  There is a "very small town called Rodeo" just across the New Mexico border that has "a handful of people that live there."  (*Id.* at 58-59.)

Agent Sartin radioed that "[h]e had two vehicles riding in tandem around mile marker 400 that [were] heading back towards Douglas[.]"  (*Id.* at 59.)  Agent Myers "radioed back" to Agent Sartin that he "would back him up if [Agent Sartin] ended up stopping one of them."  (*Id.*)  Agent Myers "saw the a blue Torrent with the Arizona paper tag first, followed by Agent Sartin, and then followed by the Chrysler 300 with California plates[.]"  (*Id.*)  The Chrysler was "almost bumper to bumper" with Agent Sartin's patrol vehicle.  (*Id.* at 60.)  Agent Myers found that driving behavior unusual because normally people "back off" from a Border Patrol vehicle.  (*Id.*)

Agent Myers started following the Chrysler in his marked Border Patrol vehicle.  (*Id.*)  He requested a records check on the Chrysler which revealed that it was registered "to a Mario out of San Jose, California[.]"  (*Id.* at 60-61.)  He found it strange that the vehicle had an actual registered owner because normally vehicles registered in California that are encountered in that area are rental vehicles.  (*Id.* at 61.)  It also did not make sense for a vehicle from California to be on Highway 80 because "there's nothing out there to do or see."  (*Id.*)  The records check also revealed that the Chrysler had crossed into the United States through the Nogales Port of Entry earlier in the day and also passed through the Border Patrol checkpoint on Interstate 19.  (*Id.*)  Agent Myers found it suspicious that the Chrysler came through the Nogales Port of Entry, travelled north on Interstate 19, and then ended up travelling southwest on Highway 80. (*Id.* at 63.)  He also found it suspicious that the vehicles were riding in tandem for a long period of time.  (*Id.*)

Agent Myers performed his traffic stop on the Chrysler "about a mile up the road" from where Agent Sartin stopped the Pontiac SUV.  (*Id.* at 64.)  The driver of the Chrysler was the defendant.  (*Id.* at 65.)

1

2      2.  Cross Examination

3          Agent Myers agreed that the TECS report reflects that the Chrysler crossed into the

4  United States and went through the Border Patrol checkpoint on January 30, 2025, three

5  days prior to the traffic stop.  (*Id*. at 65-68.)

6          Highway 80 is a well maintained two-lane paved road that connects Douglas,

7  Arizona with Interstate 10, which leads to New Mexico and Texas.  (*Id*. at 69-70.)   The

8  population of Douglas is about 15,000 people.  (*Id*. at 69.)   The Chrysler and SUV could

9  have been coming from Interstate 10, New Mexico, or Texas.  (*Id*. at 70.)

10         Agents were advised at muster that there was a group of three to five suspected

11  illegal aliens who had not been apprehended.  (*Id*. at 71.)  Agents were not told when these

12  individuals were spotted, where they crossed the border, or about any vehicle(s) that may

13  be picking up these individuals.  (*Id*. at 71.)  The Douglas area of responsibility for Border

14  Patrol is about a thousand-square-mile area.  (*Id*.)

15         Agent Myers followed the vehicles and Agent Sartin for about eight to nine miles

16  before he stopped the Chrysler.  (*Id*.)  The vehicles were not speeding or driving too slowly,

17  they were not driving erratically, and they did not make any unusual turns.  (*Id*. at 71-72.)

18  Both vehicles were "appropriately registered," and neither was a rental vehicle.  (*Id*. at 72.)

19  Rental vehicles "can be suspicious to Border Patrol" agents.  (*Id*. at 73.)  Agent Myer's

20  report does not mention the distance between the Chrysler and Agent Sartin's patrol

21  vehicle, the window tint on either vehicle, or that the driver of the Chrysler appeared

22  nervous.  (*Id*. at 72-73.)  There were "no problems with the [window] tint" on either

23  vehicle; Agent Myers could see through the windows of both vehicles.  (*Id*. at 73.)

24      3.  Re-Direct Examination

25         When Agent Myers runs a records check on a vehicle that he is following, he is not

26  provided with the actual TECS report.  (*Id*. at 75.)  The dispatch operator told him over the

27  radio that the Chrysler went through the port of entry and checkpoint earlier that morning.

28  (*Id*.)  Agent Myers had not seen the TECS report prior to his testimony. (*Id*.)

- 9 -

4.  The Court's Examination

Agent Myers believes that Agent Sartin likely heard the radio communication about the Chrysler crossing through the port of entry and checkpoint earlier that day because he was on the same radio frequency. (*Id.* at 77.)  That information was significant to Agent Myers because "there's no reason that a vehicle, if their destination was Douglas, would need to go all the way up to I-10 and then take it all the way over to Road Forks and then down to [Highway] 80 east," because there are multiple ways to get to Douglas before Highway 80. (*Id.* at 78.)  That route adds another hour to get to Douglas. (*Id.*)

With respect to significance of the vehicles travelling southwest on Highway 80 toward the border, Agent Myers believes it would have been almost more suspicious for a vehicle that has taken I-10 "to turn around and go back to I-10 and do a quick turnaround versus just continuing into Douglas and never hitting" any of the license plate readers. (*Id.* at 79.)  It is a common practice for alien smugglers to use tandem drivers. (*Id.*)  The vehicle that has the illegal aliens is usually in front and the vehicle behind is used to "kind of stop the agent from getting behind the vehicle that has the illegal aliens in it." (*Id.*)  That said, this "was the first time [Agent Myer's had] ever seen a car drive like this[.]" (*Id.* at 84.)  The driver of the second vehicle will often drive erratically to get the agent to stop that vehicle so the load vehicle gets away. (*Id.*)

Agent Myers has never seen a vehicle tailgate a law enforcement vehicle like the Chrysler did here. (*Id.* at 80.)  Again, it is more common for the second vehicle to speed away, slow down, swerve, or do whatever they can to get law enforcement to pull over that vehicle instead of the smuggling vehicle. (*Id.*)  The driver of Chrysler did not engage in any such driving behavior. (*Id.* at 84.)  In Agent Myers' experience, it is difficult to tie the scout vehicle to the load vehicle as was done in this case. (*Id.* at 81.)

## II.    DISCUSSION

### A.    Fourth Amendment—In General

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles

1    that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

2    (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417

3    (1981)).  "The Fourth Amendment applies to all seizures of the person" and a person is

4    "seized" when "a police officer accosts an individual and restrains his freedom to walk

5    away." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  In order for law

6    enforcement officers to conduct a lawful vehicle stop, there must be reasonable suspicion

7    that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States*

8    *v. Sokolow*, 490 U.S. 1, 7 (1989).

9        "Reasonable suspicion is defined as 'a particularized and objective basis for

10   suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*,

11   709 F.3d 952, 968 (9th Cir. 2013) (en banc) (quoting *United States v. Cortez*, 449 U.S. 411,

12   417–18 (1981)).  "The reasonable-suspicion standard is not a particularly high threshold to

13   reach." *United States v. Valdes-Vega,* 738 F.3d 1074, 1078 (9th Cir. 2013).   Although "a

14   mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise

15   to the level required for probable cause, and it falls considerably short of satisfying a

16   preponderance of the evidence standard." *Id.* (quoting *Arvizu*, 534 U.S. at 274) (citations

17   and internal quotation marks omitted).  "Rather, reasonable suspicion exists when an

18   officer is aware of specific, articulable facts which, when considered with objective and

19   reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-*

20   *Camargo,* 208 F.3d 1122, 1129 (2000) (quoting *Cortez*, 449 U.S. at 418).   This

21   particularized suspicion is two-fold, including "the totality of the circumstances" and

22   "reasonable suspicion that *the particular person being stopped* has committed or is about

23   to commit a crime." *Id*. (emphasis in original).

24        **B.    Totality of the Circumstances**

25        When determining if there was reasonable suspicion for a vehicle stop, the court

26   must consider the "totality of the circumstances of each case to see whether the detaining

27   officer has a particularized and objective basis for suspecting legal wrongdoing." *United*

28   *States v. Arvizu*, 534 U.S. 266, 273 (2002).  The Supreme Court has recognized that "[a]ny

number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975).  The factors an officer may consider include: (1) the characteristics of the area in which they encounter the vehicle; (2) the proximity to the border; (3) the usual traffic patterns on the particular road; (4) previous experience with alien traffic; (5) information regarding recent illegal border crossings in the area; (6) driving behavior, such as erratic driving or obvious attempts to evade officers; (7) the behavior and appearance of the driver; and (8) aspects of the vehicle itself.  *Id*. at 884–85 (citations omitted).  This list is non-exhaustive.  "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion."  *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

The Supreme Court has held that courts should not engage in a "divide-and-conquer analysis" when reviewing the factors considered by law enforcement.  Arvizu, 534 U.S. at 274.    Stated another way, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent explanation.  *Arvizu*, 534 U.S. at 273–275.  The Supreme Court has held that "even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion."  *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (citing *Arvizu*, 534 U.S. at 274).   Therefore, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when analyzing the totality of the circumstances.  *Arvizu*, 534 U.S. at 273–75; *see also Cotterman*, 709 F.3d at 970 ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances.").

Although an "an officer's experience may furnish the background against which the relevant facts are to be assessed[,] … 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis."  *Montero-Camargo*, 208 F.3d at 1131.  That said, when looking at the "totality of the circumstances" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions

1    about the cumulative information available to them that 'might well elude an untrained

2    person.'" *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "In other words,

3    an officer's experience may furnish the background against which the relevant facts are to

4    be assessed, as long as the inferences he draws are objectively reasonable." *United States*

5    *v. Montero-Camargo*, 208 F.3d, 1122, 1131 (2000).  As a result, "the facts supporting

6    reasonable suspicion must be filtered through the lens of the [law enforcement officer's]

7    training and experience" and a court must give "due weight" to factual inferences drawn

8    by officers.  *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

9    **III.   ANALYSIS**

10       The instant motion turns on the credibility of Agent Sartin's testimony.  Agent

11   Sartin clearly had a hunch that the vehicles were smuggling illegal aliens when he decided

12   to follow the vehicles.  He then attempted to gather facts to support his hunch.  While some

13   of those facts are true, one important fact is clearly not true, and the truth of other important

14   facts is suspect.  As a result, the Court finds Agent Sartin's testimony incredible on

15   important facts that led to him to conclude that he had a reasonable suspicion to stop the

16   vehicles.   Additionally, there are facts relied on by both agents that are inconsistent with

17   the agents' experience of how alien smugglers operate.  For these reasons, the Court

18   concludes that there was not reasonable suspicion to stop the defendant's vehicle.

19       **A.   Agent Sartin's Credibility**

20       The Court first notes that the formal discipline that resulted from Agent Sartin's

21   false reporting to the law enforcement officer who responded to a traffic accident is a

22   significant blemish on Agent Sartin's record.  As a result, it is fair to view Agent Sartin's

23   testimony through that lens.

24       The most troubling portion of Agent Sartin's testimony was his inability to see if

25   there were people in the rear passenger area of the SUV because of the window tint.  On

26   direct examination, he testified that he could not see into the passenger area of the SUV

27   because "the vehicle had dark tint in the rear windows[.]"  (Hr'g Tr. 11/3/25 at 19-20, Doc.

28   75.)  On re-direct examination, he again testified that he could not see if there were

passengers in the SUV because the rear windows were tinted.  (*Id*. at 44.)  After being shown photographs of the SUV – where the passenger seats are clearly visible through the rear windows -- and asked pointed questions by the Court, Agent Sartin changed his testimony.  He testified that:  "[I]f there were people sitting upright" in the Pontiac SUV, he "would have been able to tell how many passengers were sitting up."  (*Id*. at 51.)  He added that he could not see if people were "laying on the floorboard or under carpet" in the rear passenger area.  However, he conceded that his inability to see if people were on the floor of the SUV was not because of the tinting; rather, it stemmed from the fact that he was "looking across" his vehicle into the Pontiac which travelling at 65 miles per hour. (*Id*.)

Agent Sartin's purported inability to see if there were passengers in the rear passenger area of the SUV because of the window tint was a significant factor in his decision to stop the vehicle.  His report reflects that as well as his initial testimony.   It is now clear that the tint on the passenger windows of the SUV is not a factor in the reasonable suspicion analysis.  The Court was not presented with an explanation for Agent Sartin's about-face in his testimony.  As a result, the Court has no choice to conclude that Agent Sartin concocted the story about the dark tint on the SUV's passenger windows to justify the stop of the vehicles.

Additionally, Agent Sartin's report omits key facts that he identified during his testimony that led to his conclusion that he had a reasonable suspicion to stop the vehicles. Law enforcement officers are trained to write detailed reports to aid them in remembering information that will become relevant at a suppression hearing and/or trial.  And that hearing or trial can occur many months (like here, ten months) or even years after the criminal activity.  Therefore, Agent Sartin's omission of key facts in his report calls into question the veracity of his testimony about these facts.

First, Agent Sartin testified that the Chrysler sedan had heavily tinted windows and he could only see the shape of the driver.   However, his report does not mention the Chrysler "having problems with tint[.]" (Hr'g Tr. 11/3/25 at 38, Doc. 75.)  In fact, Agent

Myers testified that he could see through the windows of both vehicles and his report does not mention the tint on the windows of either vehicle. (*Id.* at 72-73.) Agent Sartin's reasonable suspicion for the stop was based, in part, on the fact that the Chrysler's heavily tinted windows obstructed his view of the driver, which is common tactic used for vehicles involved in alien smuggling. The truth of that fact is suspect.

Second, and perhaps more importantly, although Agent Sartin's report states that the vehicles were "driving in tandem," the report does not mention the distance between the vehicles or that the Chrysler was "tailgating" the SUV. Those omissions are startling because Agent Sartin's testimony makes clear that the Chrysler's consistent and continuous driving one-and-a-half car lengths behind the SUV was the lynchpin for stopping the defendant's vehicle. Specifically, he testified that he concluded that the vehicles were driving in tandem driving because of the short distance between the vehicles when he first saw them and while he followed them for ten miles.[1] The absence of any mention of the distance between the vehicles in Agent Sartin's report, written shortly after the stop, casts doubt on the veracity of his testimony ten months later on this important issue.

**B.  The aspects of the vehicles, the tandem driving, and the driver's behavior.**

Agent Myers found it "strange" that the Chrysler was registered to an "actual owner" in California. He testified that rental vehicles are suspicious to Border Patrol agents and when agents suspect that a vehicle with a California license plate is involved in alien smuggling, the registration almost always comes back to a rental vehicle. And that is especially the case in the area on Highway 80 where the stop occurred. Thus, the registration of the Chrysler to an actual owner in California is not consistent with the way alien smugglers operate.

The alleged tandem driving is also not consistent with Agent Sartin's experience of how alien smugglers operate because the suspected load vehicle (the Pontiac SUV) was

---

[1] It is worth noting that the sedan was clearly not "tailgating" the SUV because Agent Sartin testified that there was enough space between the vehicles for him to see the California license plate on the front bumper of the sedan which was travelling around 65 miles per hour.

travelling in front of the suspected scout vehicle (the Chrysler sedan).  Agent Sartin explained that a "handler" coordinates with people in Mexico.  (Hr'g Tr. 11/3/25 at 47, Doc. 75.)  The handlers "don't necessarily trust the people they recruit" to drive the load vehicle "because they don't typically know them from cities of Tucson and Phoenix.  So they recruit a driver that's going to be taking the risk if they are caught, and, obviously, the handler kind of isolates themselves from the risk."  (*Id*.)  Agent Sartin further explained that when tandem driving is used to transport illegal aliens, "[t]here's commonly a scout or another vehicle that drives" with the load vehicle to "take it out of the driver's hands and secure what they're picking up.  So one driver doesn't even know where they're going to be picking up these illegal aliens."  (*Id*. at 21-22.)

Although Agent Sartin's testimony is not crystal clear on this point, the Court's understanding of Agent Sartin's experience with tandem driving is that load drivers do not know the location where the illegal aliens will be picked up and dropped off because alien smuggling organizations do not know or trust the load drivers.  The organization will "take it out of the [load] driver's hands and secure what they're picking up" (*i.e.*, the illegal aliens), by having the load vehicle follow the scout vehicle to the pick-up and drop-off locations.[2]  (*Id*. at 21-22.)  Agent Sartin's testimony clearly shows that he suspected that the Pontiac SUV was the load vehicle for the following reasons: (1)  a SUV has more cargo capacity than a sedan so he pulled next to the SUV to look in the rear passenger area to check for passengers either seated upright or concealing themselves; (2) the temporary tag on the SUV was consistent with the practice of alien smugglers buying cheap vehicles shortly before the smuggling event to minimize loss if the vehicle transporting illegal aliens is ultimately seized by law enforcement; (3) Agent Sartin was definitely going to stop the SUV when he observed that the driver was nervous, which made him suspicious that there were illegal aliens in the SUV; and (4) he positioned his patrol vehicle between the SUV and the Chrysler so he could stop the vehicle that he believed contained the contraband

---

[2]  If the government believes that the Court's understanding of Agent Sartin's experience with tandem driving is incorrect, it was the government's burden to make it crystal clear.

(*i.e.,* the illegal aliens). Based on Agent Sartin's experience with tandem driving and his suspicion that the SUV was the load vehicle, the Chrysler trailing the SUV weighs against the government in the reasonable suspicion analysis.

In addition to the suspected scout vehicle travelling behind the suspected load vehicle being inconsistent with the Agent Sartin's experience with tandem driving, the Chrysler's failure to pass the SUV, slow down, or make a turn, is inconsistent with the tactics used by scout vehicles. Agent Sartin did not testify that continued tandem driving while the vehicles are being followed by a Border Patrol agent is a tactic used by alien smugglers. He testified that the scout vehicle will "take off" or use other tactics to try to mislead Border Patrol agents. Similarly, Agent Myers testified that at some point the scout vehicle almost always slows down, speeds up, or turns off the road to divert the attention of Border Patrol agents from the load vehicle. Additionally, Agent Myers testified that he has never seen tandem driving where a vehicle tailgates a Border Patrol vehicle like the Chrysler did here. He found that driving behavior unusual because normally people "back off" from a Border Patrol vehicle. Moreover, Agent Sartin did not testify that he has encountered that type of driving behavior during an alien smuggling event. Thus, the absence of any attempt by the defendant to divert or mislead Border Patrol agents or engage in other driving behavior consistent with a scout vehicle also weighs against the government in the reasonable suspicion analysis.

Against this backdrop, there are innocuous reasons and fair inferences that can be drawn for why the Chrysler did not pass the SUV. Agent Sartin testified that when his vehicle was parked at mile marker 398 on Highway 80, he was able to observe the tandem driving for a mile or two because he was located on a long straightaway. It stands to reason that if Agent Sartin could see the vehicles from that distance on this straightaway, the drivers of both vehicles could see his marked patrol vehicle parked on the side of Highway 80. Moreover, it is fair to say that laypeople do not know that a Border Patrol agent cannot stop their vehicle based on a traffic violation such as speeding. As a result, it makes sense that the Chrysler did not pass the SUV as the vehicles were approaching Agent Sartin's

location.  The same is true during the ten mile stretch while Agent Sartin followed the vehicles.  Agent Sartin testified that the speed limit was 65 miles per hour (and 55 miles per hour in some areas) on Highway 80.  He also testified that he was driving about 65 miles per hour when driving beside the SUV.  Thus, it makes sense that the defendant was not going to exceed the speed limit to pass the SUV when Agent Sartin was behind the defendant's vehicle or when Agent Sartin was in front of his vehicle.  In fact, if the defendant had passed the SUV and exceeded the speed limit at any point, it would have been even more suspicious because, once again, both agents testified that the scout vehicles often speed up or engage in other tactics to distract law enforcement.

With respect to the driver of the SUV gripping the steering wheel tightly, appearing stiff, and looking straight ahead and not at Agent Sartin as he was driving beside the SUV, the Ninth Circuit has held that reasonable suspicion that is based on eye contact or lack thereof is highly subjective and can devolve into a case of "damned if you do, equally damned if you don't."  *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000).  As a result, that court has noted that this factor is "of questionable value . . . generally."  *Montero-Camargo*, 208 F.3d at 1136.   That is the case here because it makes sense that the driver of the SUV was "white-knuckled" and focused on the road ahead given the safety concern presented by Agent Sartin driving beside her in the opposing lane of traffic on a two-lane highway.   Moreover, as the Ninth Circuit has commented, there is no doubt that if the driver of the SUV had looked at Agent Sartin, either through the rearview and/or side mirrors or through the window when he was driving beside her vehicle, she would have been "damned if she did" because that would have also been suspicious driving behavior.

Additionally, it is human nature for a person who is not engaged in criminal activity to exhibit signs of nervousness when a law enforcement officer appears to be following them.  As discussed above, the driver is concerned about committing a traffic infraction that could lead to a vehicle stop; and that is especially true when a law enforcement officer follows a vehicle for ten miles.  In fact, Agent Sartin testified that drivers are "usually

nervous when I pull alongside of them, especially if they're engaged in something illicit."
(*Id*. at 20.)   Agent Sartin's use of the qualifier "especially" shows (or at least implies) that his experience is that most drivers are nervous when he pulls his Border Patrol vehicle alongside of their vehicle even if the driver is not engaged in something illicit.

Finally, there is no basis for Agent Sartin's assumption that the driver of the SUV should have been relaxed because she had been driving many miles for many hours.  He did not know where she came from or how long she had been driving.

### C.    Usual traffic patterns

Both agents testified that traffic on Highway 80 is light, especially on a Saturday. The light traffic likely led to Agent Sartin's hunch that the SUV and sedan were engaged in alien smuggling.  Stated another way, he concluded that there was no reason for a vehicle from California and a vehicle from Tucson to be travelling on Highway 80 early Saturday morning.  However, in drawing that conclusion, Agent Sartin assumed that the vehicles were headed to California and Tucson and should have stayed on Interstate 10 and not gone southwest on Highway 80.  There is no basis for those assumptions.

### D.    The TECS Hit

Agent Myers was advised by Border Patrol dispatch that a TECS inquiry revealed that the Chrysler had crossed into the United States through the Nogales Port of Entry earlier in the day and then passed through the Border Patrol checkpoint on Interstate 19. Agent Myers testified on direct examination that he found it suspicious that the Chrysler came through the Nogales Port of Entry, travelled north on Interstate 19, and then ended up travelling southwest on Highway 80.   When asked by the Court to explain why that information was suspicious, Agent Myers testified that "there's no reason that a vehicle, if their destination was Douglas, would need to go all the way up to I-10 and then take it all the way over to Road Forks and then down to SR 80 east," because there are multiple ways to get to Douglas before SR 80.   (Hr'g Tr. 11/3/25 at 78.)

After being provided with the TECS report, Agent Myers conceded that Border Patrol dispatch provided him with the wrong date that the Chrysler crossed into the United

States through the Nogales Port of Entry and passed through the immigration checkpoint on Interstate 19. The TECS report shows that the correct date is January 30, 2025, and not February 1, 2025, the date of the stop.[3] Even if the Chrysler had crossed into the United States on February 1, 2025, and travelled north on Interstate 19, Agent Myers makes assumptions about the Chrysler's destination and route of travel. He first assumes that the Chrysler's destination was Douglas, Arizona. He also assumes that because the Chrysler went through the Interstate 19 checkpoint, it must have traveled north on Interstate 19 to Interstate 10 and then took that road east to Highway 80. There is no basis for either assumption.

**E.    The proximity to the border, the characteristics of the area where the vehicles were encountered, previous experience with alien smuggling traffic in the area, and recent illegal entrant activity.**

There is no doubt that Agent Sartin first encountered the SUV and Chrysler relatively close to the United-States-Mexico border in a remote area where Border Patrol agents routinely see illegal alien traffic – *i.e.*, about 30 miles from the border town of Douglas, Arizona. In fact, both agents were told at muster about a group of three to five suspected illegal aliens that had not been apprehended. It is arguable that any remote area south of Tucson is an area where Border Patrol agents see illegal alien traffic. For example, the Border Patrol's area of responsibility for the Douglas sector is over a thousand square miles. The same is presumably true for the Border Patrol's other areas of responsibility. That said, these factors still weigh in favor of the government in the reasonable suspicion analysis. But these factors do not amount to reasonable suspicion given the other factors discussed above.

---

[3] The Court notes that government counsel did not argue that Agent Myers was entitled to rely on this mistake of fact. Rather, government counsel argued that "there is ultimately a discrepancy with regard to the dates [Agent Myers] believed he overheard and what the dates were actually reported in the system However, even taking that into account, the travel pattern for this Chrysler300 is very unusual and something that goes into their analysis of whether or not they had reasonable suspicion to conduct a traffic stop of not only the Pontiac, but also of the black Chrysler 300." (Hr'g. Tr. 11/3/25 at 89, Doc. 75.).

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge grant the Defendant's Motion to Suppress for Lack of Reasonable Suspicion (Doc. 50).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-25-01233-TUC-AMM.**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 9th day of December, 2025.

Eric J. Markovich
United States Magistrate Judge