WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Mario Humberto Flores-Mendivil,<br><br>Defendant. | No.   CR-25-01233-001-TUC-AMM (EJM)<br><br>**ORDER** |

On February 1, 2025, United States Border Patrol arrested Defendant Mario Humberto Flores-Mendivil near Douglas, Arizona for suspected conspiracy to transport illegal aliens. At the time of his arrest, Defendant was the driver and sole occupant of a Chrysler 300 that appeared to be driving in tandem behind a Pontiac Torrent on State Route 80 ("SR 80"). United States Border Patrol conducted stops of both vehicles. Agent Dalton Myers stopped Defendant's Chrysler, and Agent Casey Sartin stopped the Pontiac. After a search, agents found three undocumented noncitizens wearing camouflage in the back of the Pontiac. Agents subsequently questioned the driver of the Pontiac who stated that Defendant was involved in the transportation of the undocumented noncitizens.[1]

Pending before the Court is Defendant's Motion to Suppress for Lack of Reasonable Suspicion. (Doc. 50.) Defendant seeks to suppress evidence obtained after Agent Myers

---

[1] The Court's docket shows that the Pontiac driver, Alanus Marston, is not a charged co-defendant in this case. Instead, an additional docket review shows that Ms. Marston was charged, plead guilty, and was sentenced by this Court in 25-cr-01162-AMM-EJM to seven months' imprisonment on June 18, 2025.

stopped his vehicle because, he argues, Agent Myers lacked reasonable suspicion. (*Id.* at 1.) The motion is fully briefed. (Docs. 50, 53, 57, 76, 84, 97.)

The motion was referred to Magistrate Judge Eric J. Markovich, who held an evidentiary hearing on November 3, 2025. (Doc. 71.) On December 9, 2025, the Magistrate Judge issued his Report and Recommendation ("R&R") in which he recommended that the Court grant Defendant's Motion to Suppress for Lack of Reasonable Suspicion. (Doc. 76.) In so doing, the Magistrate Judge concluded that the "instant motion turns on the credibility of Agent Sartin's testimony[,]" which the Magistrate Judge found to be "incredible on important facts that led to [sic] him to conclude that he had a reasonable suspicion to stop the vehicles." (*Id.* at 13.)

On January 6, 2026, the Government filed written objections challenging the Magistrate Judge's recommendation to suppress and noting, in relevant part, that the Magistrate Judge's focus on Agent Sartin's credibility minimized the fact that it was Agent Myers—and not Agent Sartin—who stopped Defendant's vehicle. (Doc. 84 at 17.) Because the Government objected in part to the Magistrate Judge's credibility finding as to Agent Sartin, this Court conducted a de novo evidentiary hearing on January 22, 2026. (Doc. 101.)

After a de novo review of the parties' briefing and the record, and for the reasons stated herein, the Court will sustain the Government's objection, reject the Magistrate Judge's recommendation, and deny the Motion to Suppress for Lack of Reasonable Suspicion.

I.      **Standard of Review**

The standard of review applied to a magistrate judge's report and recommendation depends on whether a party files objections. *See Thomas v. Arn*, 474 U.S. 140, 149–50 (1985). A district court need not review "a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Id.* at 150.

If, however, a party objects, the district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28

U.S.C. § 636(b)(1)(C). Although the district court is not required to review an issue de novo absent a proper objection, the statute "does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154.

Furthermore, "[u]nder the law of this circuit, a district court errs when it does not conduct a de novo evidentiary hearing if it rejects the credibility finding of a magistrate judge who recommends the granting of a motion to suppress." *United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002). Likewise, "a district court may not reject the factual findings of a magistrate judge on a motion to suppress without conducting a de novo evidentiary hearing." *Id.* at 1155 (citing *United States v. Bergera*, 512 F.2d 391, 392–94 (9th Cir. 1975)).[2]

## II.   Facts

Agent Myers has approximately three and a half years of experience working mostly in the border region near Douglas, Arizona. (Doc. 75 at 54; Doc. 107 at 41.) Agent Sartin has more than 15 years of experience stationed in Douglas. (Doc. 107 at 10.)

At approximately 6:00 a.m. on Saturday, February 1, 2025, Agent Myers and Agent Sartin were on duty and attended muster where they learned that a group of three to five undocumented noncitizens was seen the day before in the mountains near SR 80. (*Id.* at 10–11, 41–43.) The group was reported between mile marker 392 and mile marker 400 on SR 80, northeast of Douglas. (*Id.* at 42–44.)

Agent Myers testified that it is common for undocumented noncitizens to travel through this area on foot and to wait overnight to be picked up by a vehicle. (*Id.* at 42, 54.) Agent Sartin explained that groups travelling on the ridgeline coming from Mexico typically wait to be picked up between mile marker 400 and mile marker 412 because the canyons funnel them in that direction. (*Id.* at 12.)

Agent Myers further clarified that SR 80 is not generally a heavily trafficked roadway and that there is little vehicle traffic on Saturdays. (*Id.* at 43.) Agent Sartin

---

[2] The Magistrate Judge did not make separate findings of fact in this matter.

- 3 -

explained that local ranchers constitute most of the sparse traffic on SR 80. (*Id.* at 13.)

At approximately 7:30 a.m., Agent Myers positioned himself at mile marker 384 to wait for additional agents and search for the group. (*Id.* at 42–43.) From his position, Agent Myers had a clear view of the highway. (*Id.* at 44.) Agent Myers then heard Agent Sartin call over the radio that he was in pursuit of a Chrysler 300 driving in tandem behind a Pontiac Torrent. (*Id.* at 15–16, 43–44.) Defendant was driving the Chrysler. (Doc. 50 at 3.) The Chrysler had California plates, and the Pontiac had a temporary Arizona license plate. (Doc. 107 at 16–19, 45.) Agent Myers heard Agent Sartin describe the vehicles and say that "he was going to attempt to get behind the vehicle with the temp tags." (*Id.* at 44.)

Agent Sartin began following the vehicles near mile marker 400. (*Id.* at 13.) He testified that it was "highly suspicio[us]" for a vehicle with a temporary Arizona license plate and a vehicle with California plates to be driving in tandem in that area. (*Id.* at 13–16.) He first emphasized that driving in tandem is a common practice for smuggling organizations because they use "scout" vehicles. (*Id.* at 16.) Agent Sartin also testified that the temporary Arizona license plate raised his suspicions because smuggling organizations commonly use "temp tags" and purchase "lower value vehicles as recruitment tools." (*Id.* at 16, 18.) He further explained that a California plate was suspicious in this duo because "[t]here isn't much reason . . . for a California plate coming westbound into the city of Douglas." (*Id.* at 16.)

After following the duo for more than ten miles, Agent Sartin entered the opposing lane of traffic to pull up alongside both vehicles. (*Id*. at 17.) The vehicles were traveling at a speed of about 65 miles per hour at this time, and there was still little traffic. (*Id*.) After pulling up next to the vehicles, Agent Sartin then attempted to merge his patrol vehicle between them. (*Id*. at 17, 19–20.) He testified, however, that it was difficult to get between the two vehicles despite signaling his intent to do so because the Chrysler and Pontiac were traveling only "a car length and a half" apart. (*Id*. at 20.) Agent Sartin explained that it was "extremely unusual" that the Chrysler did not allow him to merge behind the Pontiac because most vehicles "will give you the leeway and make room for you because . . . they see [] a marked vehicle . . . ." (*Id.*)

- 4 -

Agent Myers was still at mile marker 384 when he first observed the trio of vehicles headed in his direction on SR 80. (*Id.* at 44.) Agent Myers "observed the first vehicle [the Pontiac] with the temp tags and then Agent Sartin and then a Chrysler with California plates behind him." (*Id.*) When questioned if he had noticed anything unusual as the vehicles passed, Agent Myers testified that he noticed the "Chrysler was directly behind [Agent] Sartin" and that the Chrysler was "bumper to bumper" with Agent Sartin's marked Border Patrol vehicle. (*Id.* at 45.) Agent Myers found it unusual that the Chrysler was tailgating a marked Border Patrol vehicle, noting that people do not typically drive "extremely close" to Border Patrol vehicles. (*Id.*) Agent Myers also testified that the Chrysler's tailgating created safety concerns. (*Id.*) After the trio of vehicles passed his location, Agent Myers pulled onto the highway and started driving behind the Chrysler. (*Id.* at 45–46.)

Agent Myers then requested a records check on the Chrysler. (*Id.* at 46.) The radio operator informed him that the Chrysler was registered "to a Mario Mendivil out of San Jose, California . . . ." (*Id.*) Agent Myers found it "significant" that the Chrysler was registered to an individual from California, rather than a rental company. (*Id.* at 46–47.) He testified that "there's nothing out there that would make any sense for somebody from San Jose to need to be out there." (*Id.* at 47.)

The radio operator also informed Agent Myers that the Chrysler crossed into the United States through the Nogales Port of Entry that morning and passed through a Border Patrol checkpoint on Interstate-19 ("I-19") about an hour later.[3] (*Id.* at 46, 48.) Agent Myers found it unusual that the Chrysler would now be traveling on SR 80 because "if your end destination was going to be Douglas, there would be no reason to ever go up I-19 to go to I-10." (*Id.* at 48–49.)

Agent Myers observed and followed the trio of vehicles for approximately eight miles. (*Id.* at 55.) At that point, Agent Sartin reported over the radio that he intended to

---

[3] After the traffic stop and subsequent investigation, Agent Myers learned this information was incorrect and the Chrysler had instead entered the United States on approximately January 31, 2025. (Doc. 107 at 49–50.) Agent Myers clarified that, at the time of the stop, he "believed it had traveled that morning." (*Id.* at 50.)

- 5 -

stop the Pontiac. (*Id.* at 50.) Agent Myers radioed that he was going to stop the Chrysler. (*Id.*) Agent Sartin pulled over the Pontiac and, approximately one mile later, Agent Myers stopped the Chrysler in a "single agent vehicle stop." (*Id.* at 50, 59–60.)

Agent Myers testified that he independently decided to conduct a stop of the Chrysler based upon a number of factors, including the location of the vehicle; his belief that the vehicle entered the United States at Nogales and drove through the I-19 checkpoint earlier that morning thereby making its whereabouts at the time of the stop suspicious; the fact that it was registered out of San Jose, California and was not a rental vehicle; and the Chrysler's unusual behavior tailgating a marked Border Patrol vehicle for several miles. (*Id.* at 49, 58–59.) Agent Myers further testified that although it was a "simultaneous stop," it was "only simultaneous because of where [Agent Myers and Agent Sartin] were in accordance with each other . . . [,]" and each agent conducted a separate, single agent vehicle stop.[4] (*Id.* at 59.)

**III.    Discussion**

As a threshold matter, Defendant challenges the stop of *his* vehicle. (Doc. 50 at 1.) The parties do not dispute that it was Agent Myers—and not Agent Sartin—who stopped Defendant's vehicle. (Doc. 50 at 1; Doc. 107 at 5.) As such, the only relevant legal issue is whether Agent Myers had reasonable suspicion to stop the Chrysler.[5] The Court finds that

---

[4] At the de novo evidentiary hearing, Agent Sartin testified that he "announced over the radio that we'd be conducting a stop on both of these vehicles roughly around mile marker 377." (Doc. 107 at 24.) Agent Sartin further testified that in so doing, he "directed" Agent Myers to pull over the Chrysler. (*Id.* at 40.) Notwithstanding this testimony, Agent Myers testified that he stopped the Chrysler *independent* of Agent Sartin pulling over the Pontiac. (*Id.* at 59.) Agent Myers testified that although he and Agent Sartin were acting "in accordance with each other," each agent was conducting a separate, single agent stop. (*Id.*) The Magistrate Judge did not find Agent Myers's testimony incredible, nor has either party objected to Agent Myers's credibility. The Court finds that Agent Myers's testimony is credible.

[5] In this Court's view, Agent Sartin's credibility as to his stop of the Pontiac is largely irrelevant as to whether Agent Myers had reasonable suspicion to stop the Chrysler. Notably, the Magistrate Judge's credibility finding as to Agent Sartin related almost entirely to his reasonable suspicion for the stop of the Pontiac, specifically, his testimony regarding window tint. (Doc. 79 at 13–15.) The Magistrate Judge found that Agent Sartin's testimony about the window tint was inconsistent and unreliable. (*Id.*) Because the Court finds that reasonable suspicion for the stop of the Pontiac is irrelevant, the Court will not reach these extraneous findings. Similarly, the Court would not and does not characterize Agent Sartin's formal discipline from 2018 as a "significant blemish on [his] record." (Doc.

he did.

Law enforcement officers may conduct an investigatory stop of a vehicle or person if they are aware of facts leading to a "reasonable suspicion" that criminal activity is afoot. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (2000) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "The reasonable-suspicion standard is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). Moreover, reasonable suspicion may be based on the collective knowledge of all agents involved in the investigation even when not all that information is communicated to the agent who conducts the stop. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).

The Court "must look at the 'totality of the circumstances'" when deciding whether an officer had reasonable suspicion to conduct a stop. *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 273); *see also United States v. Cotterman*, 709 F.3d 952, 970 (9th Cir. 2013) ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances."). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal citations omitted). "It also precludes a 'divide-and-conquer analysis' because even though each of the suspect's 'acts was perhaps innocent in itself . . . taken together, they [may] warrant[] further investigation.'" *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 274). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

There are several factors that the Court may consider when deciding whether an agent had reasonable suspicion to stop a vehicle in the border area. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975). "Not all of these factors must be present or

---

76 at 13; Doc. 107 at 37.) Rather, as to Agent Sartin's testimony at the de novo evidentiary hearing, the Court finds that Agent Sartin was credible.

- 7 -

highly probative in every case to justify reasonable suspicion." *Valdes-Vega*, 738 F.3d at 1079. The factors include the characteristics of the area, proximity to the border, usual traffic patterns on the road, the agent's previous experience with smuggling operations, information about recent illegal border crossings in the area, behavior of the driver, and characteristics of the vehicle. *Brignoni-Ponce*, 422 U.S. at 884–85.

The Court finds that Agent Myers articulated several facts that provided him with reasonable suspicion to conduct an investigatory stop of the Chrysler. Indeed, all the *Brignoni-Ponce* factors are present in this stop.

Agent Myers's experience, the proximity to the border, and the characteristics of the area support reasonable suspicion. Agent Myers has worked for more than three years in the Douglas area close to the border. He is familiar with that section of SR 80 as a well-known corridor for smuggling undocumented noncitizens. As part of the collective knowledge of the agents involved, Agent Sartin explained that it is common for groups to travel the ridgeline and wait near mile marker 400 to be picked up. Furthermore, Agent Myers had information about recent illegal border crossings in that particular area. Agent Myers had been briefed that morning that a group of three to five undocumented noncitizens was seen the day before between mile markers 392 and 400.

Likewise, the usual traffic patterns on the road, behavior of the Chrysler, and the Chrysler's characteristics gave Agent Myers reason to suspect criminal activity. Agent Myers testified that Saturdays are slow on SR 80, and Agent Sartin explained that most of the vehicles seen are local ranchers. Agent Myers heard Agent Sartin radio that he was following the Pontiac and the Chrysler from mile marker 400, where undocumented noncitizens commonly exit the mountains and where the group from the day before had been reported. Agent Sartin also informed Agent Myers that the vehicles had been driving in tandem for several miles, which Agent Sartin flagged as a common practice for smugglers. Agent Myers then personally observed the Pontiac, Agent Sartin, and the Chrysler driving westbound from mile marker 400. Agent Myers noted the temporary Arizona license plate on the Pontiac and the California plates on the Chrysler. Agent Sartin explained that the tandem driving in this case was particularly suspicious because the

Pontiac had temporary tags and the Chrysler had California plates. Based on their training and experience, Agent Myers and Agent Sartin know that not only is tandem driving a practice among smugglers, but that smugglers often use vehicles with temporary tags. To see both these practices together was suspicious. Agent Myers further believed that the Chrysler's behavior tailgating Agent Sartin was suspicious, and he began to follow the trio.

Agent Myers ran the California plates and received information that the Chrysler was registered to an individual from San Jose, California, which he thought was unusual. He was also informed that the Chrysler had crossed into the United States that day in Nogales and had been driving on I-19 before coming to SR 80.[6] Agent Myers found this behavior suspicious because the driver would have gone far out of his way for no apparent reason. Agent Myers then continued to follow and observe the Chrysler for eight miles, during which time the Chrysler continued to drive unusually close to Agent Sartin, creating not only a safety concern, but raising suspicion for Agent Myers because it was unusual to see someone drive bumper to bumper with a marked patrol vehicle rather than slowing down or passing Agent Sartin.[7]

Under these facts, the Court finds that Agent Myers had reasonable suspicion to stop the Chrysler. Although, on their own, each of these facts may have an innocuous explanation, the Court is not permitted to assess them in isolation through a divide-and-conquer lens. *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 273). Rather, the standard requires the Court to look at the totality of the circumstances surrounding the stop. *Cotterman*, 709 F.3d at 970.

Based on the totality of the circumstances, Agent Myers met the low standard of reasonable suspicion when he stopped the Chrysler. Agent Myers's experience as an agent;

---

[6] Agent Myers was entitled to rely on this mistaken information in forming the basis for his reasonable suspicion. *See United States v. Twilley*, 222 F.3d 1092, 1096 n.1 (9th Cir. 2000) (citing *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000)) ("A factual belief that is mistaken, but held reasonably and in good faith, can provide reasonable suspicion for a traffic stop.")

[7] The Court recognizes that the Magistrate Judge found the agents' testimony regarding tandem driving by smugglers "inconsistent" with their experience in this case. (Doc. 76 at 17.) The Court does not reach the same conclusion because, although perhaps a novel tactic, the act of tailgating a law enforcement vehicle could reasonably be seen as an effort to distract or interfere with law enforcement's investigation of the other vehicle.

the proximity to the border when Agent Myers stopped the Chrysler; the characteristics of the area as a well-known corridor for smuggling; the information Agent Myers received about a group of undocumented noncitizens on that stretch of SR 80; the fact that the Pontiac and Chrysler did not fit usual traffic patterns for a Saturday in the area; the fact that the Pontiac had temporary Arizona tags, a common practice for smugglers; the fact that the Chrysler had California plates and was registered to an individual from San Jose with no apparent reason to be on SR 80 after driving on I-19; the fact that these two vehicles, with these plates, were also driving in tandem, a common practice for smuggling operations; and the behavior of Defendant in the Chrysler tailgating a marked Border Patrol vehicle for miles, taken together, led Agent Myers to reasonably suspect a smuggling operation was afoot.

Accordingly, the Court will deny Defendant's Motion to Suppress for Lack of Reasonable Suspicion.[8]

### IV.   Conclusion

The Court has reviewed the Motion to Suppress for Lack of Reasonable Suspicion (Doc. 50), the Government's Response (Doc. 53), Defendant's Reply (Doc. 57), the official transcript of the evidentiary hearing conducted before the Magistrate Judge (Doc. 75), the Magistrate Judge's R&R (Doc. 76), the Government's Objections (Doc. 84), and Defendant's Response (Doc. 97). The Court additionally held a de novo evidentiary

---

[8] One final observation. At the evidentiary hearing, Defendant argued "fruit of the poisonous tree." (*See* Doc. 107 at 6–7.) Defendant's theory is unclear, but to the extent he raises fruit of the poisonous tree as to the Chrysler, Agent Myers's investigatory stop did not violate the Fourth Amendment. To the extent he raises fruit of the poisonous tree as to the Pontiac, he is precluded from doing so. A defendant may challenge evidence as fruit of the poisonous tree if the defendant establishes that *his* Fourth Amendment rights were violated in the primary search. *See United States v. Baker*, 58 F.4th 1109, 1116 (9th Cir. 2023) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)) ("Fourth Amendment rights are personal rights that 'may not be vicariously asserted.'"). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Defendant has not argued that *his* Fourth Amendment rights were violated when Agent Sartin stopped the Pontiac. Nor has he shown that Agent Sartin stopped or searched the Pontiac *based on* Agent Myers's stop of Defendant's Chrysler. Therefore, Defendant's effort to suppress fruit from the tree that is the stop of the Pontiac fails because, simply put, that is not his tree.

hearing and considered the testimony and argument offered therein. (Doc. 107.)

Upon de novo review,

**IT IS ORDERED** that the Magistrate Judge's Report and Recommendation is **NOT ADOPTED**. (Doc. 76.)

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress for Lack of Reasonable Suspicion is **DENIED**. (Doc. 50.)

Dated this 2nd day of February, 2026.

_____
Honorable Angela M. Martinez
United States District Judge